**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE HANFT, | ) | CASE NO. 1:15-CV-200 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Wayne Hanft ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On May 10, 2013, and May 22, 2013, Plaintiff filed his applications for POD, DIB,

and SSI, alleging a disability onset date of January 1, 2010. (Transcript ("Tr.") 9.)  The

claims were denied initially and upon reconsideration, and Plaintiff requested a hearing

before an administrative law judge ("ALJ").  (*Id.*)  On August 19, 2014, an ALJ held

Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by

counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.

(*Id*.)  On September 3, 2014, the ALJ found Plaintiff not disabled.  (Tr. 21.)  On December 4, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On January 30, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ failed to provide good, specific, and supported reasons for discounting the opinions of the treating and examining physicians; and (2) the ALJ erred by failing to consider Plaintiff's strong work history when determining his RFC and assessing his credibility.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born on June 12, 1957, and was 55-years-old on the alleged disability onset date.  (Tr. 20.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  He had past relevant work as a fast food and short order cook.  (*Id.*)

### B.   Medical Evidence

#### 1.   Medical Reports Relating to Physical Impairments

During March 2012, Plaintiff underwent an x-ray of his right ankle. (Tr. 251.)  The x-ray showed subchondral cysts. (*Id.*)  The reviewing radiologist concluded that the findings could be post-traumatic, but the unusual appearance suggested the possibility of asynovitis or, in the alternative, erosive arthritis, which was less likely. (*Id.*)  The

2

radiologist recommended correlation with clinical and laboratory data. (*Id.*)

On September 14, 2012, Plaintiff treated with primary care physician Carolyn Kuerbitz, M.D. (Tr. 348.)  Plaintiff reported that he resided alone in public housing, smoked one pack of cigarettes each day, and walked "a lot." (Tr. 350.) A physical examination showed clear lungs and no edema. (*Id.*)  Plaintiff had recently been diagnosed with diabetes, and Dr. Kuerbitz prescribed Metformin and Glipizide. (*Id.*)  For further diabetic care, the doctor referred Plaintiff to a nutritionist, an optometrist, and a podiatrist. (*Id.*)

Plaintiff returned to Dr. Kuerbitz on October 23, 2012, with complaints of sinus and chest congestion. (Tr. 308, 310.)  Dr. Kuerbitz noted a marked improvement in Plaintiff's blood sugar readings and that Plaintiff had adjusted his diet. (Tr. 310-11.) Later that month, during treatment with podiatrist Jonathan Logan, D.P.S., Plaintiff reported occasional numbness in the little toe on the left foot, but otherwise denied pain. (Tr. 312.)  Dr. Logan documented Plaintiff's complaints of decreased sensation, but a physical examination was otherwise normal. (Tr. 315.)

On June 5, 2013, Plaintiff reported right ankle pain to Dr. Kuerbitz. (Tr. 271.) Plaintiff explained that years ago, during his tenure with the Navy, he jumped over a ten foot fence and fractured his right leg. (*Id.*)  Although an ankle injury was never documented, Plaintiff believed he injured his ankle based on the way he landed on his foot. (*Id.*)  He complained of constant daily ankle pain, which had begun over the past few months. (*Id.*)  Plaintiff did not drive and had to walk everywhere he went. (*Id.*)  Now, he could not walk more than three blocks without ankle pain. (*Id.*)    There was no

3

obvious swelling in the ankle upon physical examination. (Tr. 272.) Plaintiff's lungs were clear, and he indicated he was not ready to quit smoking. (*Id.*)  Dr. Kuerbitz prescribed Diclofenac for Plaintiff's ankle pain. (*Id.*)  During this visit, Plaintiff asked Dr. Kuerbitz to fill out a form related to his disability application. (*Id.*).  The doctor asked Plaintiff about his ability to lift, and Plaintiff reported that he had a hernia and was afraid to do much lifting. (*Id.*)  When asked about bending and twisting, Plaintiff stated that the activity caused muscle cramps. (*Id.*)

On June 26, 2013, Plaintiff treated with Dr. Logan. (Tr. 263.) Plaintiff complained of occasional numbness in the little toe on the left foot. (*Id.*)  During a physical examination, Plaintiff reported pain in the lateral right ankle and Achilles tendon. (Tr. 267.) Dr. Logan diagnosed possible degenerative joint disease (DJD) or tendinitis. (*Id.*) He prescribed rest, ice, compression, and elevation (RICE) therapy and orthotics. (*Id.*) In August 2013, Plaintiff was fitted for orthotics due to tendinitis. (Tr. 523.)

On October 23, 2013, Dr. Kuerbitz diagnosed chronic obstructive pulmonary disease (COPD). (Tr. 417.)  The doctor prescribed Albuterol as needed and advised Plaintiff to stop smoking. (*Id.*)  During a session with his nutritionist that day, Plaintiff reported walking a few times per week, as well as riding a stationary bike five to ten miles. (Tr. 419.)

Plaintiff presented to Dr. Logan on November 7, 2013. (Tr. 405.)  During a physical examination Plaintiff reported pain in the medial right ankle. (Tr. 410.)  Dr. Logan modified Plaintiff's right orthotic, prescribed Diclofenac, and noted that he "may want to order an ankle brace." (Tr. 411.)

4

On November 8, 2013, Dr. Kuerbitz completed a medical source statement describing Plaintiff's physical limitations. (Tr. 602-04.)  She listed Plaintiff's diagnoses as diabetes, hypertension, depression, emphysema, and right ankle pain. (Tr. 602.)  Dr. Kuerbitz reported that Plaintiff could walk three city blocks without rest. (*Id.*)  He could continuously sit for a total of six hours and stand or walk for a total of two hours in an eight-hour workday. (*Id.*)  Plaintiff could occasionally lift up to 20 pounds, and frequently lift 10 pounds or less. (Tr. 603.)  He could bend or twist for 25 percent of an eight-hour workday. (*Id.*)  He needed to avoid exposure to fumes, odors, dust, and gas. (Tr. 604.)  He could occasionally twist, stoop, crouch, and climb stairs, but never climb ladders. (*Id.*)  Dr. Kuerbitz concluded that Plaintiff's impairments were *not* likely to cause good and bad days, but that Plaintiff would likely be absent from work more than twice per month. (*Id.*)

On February 5, 2014, Plaintiff returned to Dr. Logan and reported that his right ankle pain was "much better" after the modification of his orthotic. (Tr. 682.)  Dr. Logan opined that Plaintiff's tendinitis was resolved. (Tr. 687.)

In March 2014, Plaintiff told Dr. Kuerbitz that he was "feeling fine" and was exercising on a stationary bike and skiing machine. (Tr. 672.)  He planned to lose weight and would like to stop using some of his medication. (*Id.*)  Plaintiff still smoked and used his inhalers a few times each week. (*Id.*)  Dr. Kuerbitz advised smoking cessation and weight loss, continued Plaintiff on his current medications, and recommended follow up in four months. (*Id.*)  Plaintiff also saw his nutritionist that day and reported that he had not been active lately due to cold weather. (Tr. 673.)  He was

using his stationary bike 30 minutes per day and planned to increase activity. (*Id.*)

### 2.    Medical Reports Relating to Mental Impairments

On September 20, 2012, Plaintiff initiated mental health treatment with the Department of Veterans Affairs. (Tr. 376.)  Plaintiff reported that Pathways Clinic had prescribed Zoloft and Abilify, which had stabilized his depressive symptoms. (*Id.*)  Plaintiff had fleeting suicidal thoughts about once a month, but had never made any suicide attempts. (*Id.*)  A mental status examination was generally normal. (Tr. 374.)  Nurse Laura Martin diagnosed depression and recommended medication management. (Tr. 376.)

Plaintiff treated with psychiatrist Laura Garlisi, M.D., in November 2012. (Tr. 304.)  Upon mental status examination, Plaintiff was cooperative, appeared relaxed and in good spirits, had good eye contact, had psychomotor activity within normal limits, had normal speech, had grossly intact cognition, had a coherent and goal-directed thought process, and denied hallucinations and suicidal ideation. (Tr. 305.)  Dr. Garlisi also observed that Plaintiff's mood was euthymic, his affect was appropriate, and he displayed good insight and judgment. (*Id.*)  In terms of substance use, Plaintiff reported smoking marijuana until 2011, heavy daily alcohol use ending two to three years prior, using synthetic marijuana in 2011, using cocaine until 2009, and some prior use of hallucinogens. (*Id.*)  Dr. Garlisi diagnosed depressive disorder with psychotic features in remission and assigned a Global Assessment of Functioning (GAF) score of 68.[1] (Tr.

---

[1]    The GAF scale rates an individual's overall psychological functioning from 0 for inadequate information to 100 for superior functioning. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). A GAF score between 61 and 70 represents some mild symptoms or some

6

307.)  She prescribed Risperidone for hallucinations, increased Plaintiff's prescription of Sertraline, and noted that Plaintiff was prescribed Trazodone for sleep. (*Id.*)

In January 2013, Plaintiff told Dr. Garlisi that he was "feeling well" and had been looking for a job. (Tr. 477.)  Plaintiff indicated that smoking artificial marijuana and alcohol withdrawal may have caused his previous hallucinations. (*Id.*)  Plaintiff's last auditory hallucination occurred approximately four months prior to his visit. (*Id.*)  Dr. Garlisi decreased Plaintiff's prescription of Risperidone and assigned a GAF score of 70. (Tr. 479.)

During April 2013, Plaintiff reported to Dr. Garlisi that he was doing well. (Tr. 282.)  Plaintiff had self-stopped Risperidone one week after his January 2013 appointment. (Tr. 282-83.)  He experienced no hallucinations and again stated his belief that drug use and withdrawal may have caused his past hallucinations. (*Id.*)  Plaintiff was sleeping well, even when he skipped Trazodone. (Tr. 283.)  He had made some friends where he was living. (*Id.*)  During a mental status examination, Plaintiff exhibited a relaxed and cooperative demeanor, normal psychomotor activity, intact cognition, a normal thought process, an euthymic mood, an appropriate affect, and good insight and judgment. (*Id.*)

In August 2013, Plaintiff reported to Dr. Garlisi that he felt "a bit down" due to right ankle pain and inability to find a job. (Tr. 440.)  Dr. Garlisi noted a mildly dysphoric mood due to pain, but otherwise, Plaintiff was alert, was relaxed, was engaged, and

---

difficulty in social or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

had a normal affect. (Tr. 441.)  She assigned a GAF score of 68 and advised Plaintiff to continue Sertraline and Trazadone. (Tr. 442.)

On November 8, 2013, Plaintiff reported to Dr. Garlisi that he was "a little depressed." (Tr. 402.)  Plaintiff stated that he had a history of frequent job losses, frequent arguments with others while on the job, and difficulty getting along with others. (*Id.*)  He also explained that he was unable to carry out some work procedures because he "took shortcuts." (*Id.*)  Dr. Garlisi opined that "clinically [Plaintiff] does not seem able to work based on previous behaviors and mood." (*Id.*)

Dr. Garlisi completed a medical source statement that day. (Tr. 611-13.)  She opined that Plaintiff had "poor or no ability" to do the following: maintain attention for two hour segments; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; deal with normal work stress; carry out detailed instructions; and deal with the stress of semi-skilled and skilled work. (*Id.*)  In support of these limitations, Dr. Garlisi made the following comments: Plaintiff lost jobs for taking "shortcuts," lost jobs for arguing, and could not carry out detailed instructions because he tried shortcuts. (Tr. 612-13.)  Dr. Garlisi further explained that besides mood problems, Plaintiff also seemed to have problems with judgment, because he repeated behaviors that caused him to lose jobs, such as arguing and not following directions. (Tr. 613.)  She opined that Plaintiff would miss work more than twice per month due to his mental impairments or treatment. (*Id.*)  Regarding Plaintiff's use of drugs and alcohol, Dr. Garlisi explained that Plaintiff was not

8

drinking and had not used drugs since early 2013. (*Id.*)

During March 2014, Plaintiff told Dr. Garlisi that he had been "feeling pretty good for the last few weeks," he was sleeping well, his energy was good, and his ankle pain had improved. (Tr. 621.)  He denied suicidal thoughts and alcohol or drug use. (*Id.*)  Plaintiff said he had not been using Trazodone regularly but still slept about seven hours every night. (*Id.*)  Dr. Garlisi observed that Plaintiff was relaxed and pleasant. (Tr. 622.)  His speech was organized, his affect was normal, and his mood was euthymic. (*Id.*)  Plaintiff's judgment and insight were fair and his cognition was within normal limits. (*Id.*)  Dr. Garlisi instructed Plaintiff to continue Sertraline and Trazadone and return in 12 weeks or sooner, if needed. (Tr. 623.)

### 3.  Agency Reports

On August 27, 2013, Dorothy Bradford, M.D., performed a consultative physical examination. (Tr. 380-87.)  The examination yielded largely normal findings, including a normal gait, a normal range of motion in all joints, and normal motor strength. (*Id.*)  In particular, Dr. Bradford observed that Plaintiff's right lower extremity had no visible abnormalities and he had a full range of motion in the right foot. (Tr. 387.)  The doctor indicated that Plaintiff had a small, reducible, non-tender umbilical hernia. (Tr. 386.)  Dr. Bradford also opined that Plaintiff may have DJD of the right lower extremity that caused pain. (Tr. 387.)  She recommended that he be restricted from standing continuously for over one hour and continuously lifting over 50 pounds. (*Id.*)

In September 2013, state agency reviewing physician John Mormol, M.D., conducted assessed the record to evaluate Plaintiff's physical limitations. (Tr. 61-62,

71-72.)  Dr. Mormol opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; stand, walk, or sit for a total of six hours in an eight-hour workday; and occasionally climb ramps, stairs, ladders, ropes, or scaffolds. (Tr. 71-72.)  On November 29, 2013, state agency reviewing physician Robert Klinger, M.D., affirmed Dr. Mormol's assessment. (Tr. 85-87, 100-02.)

State agency reviewing psychologist Vicki Warren, Ph.D., conducted a review of the record in September 2013. (Tr. 70.)  She opined that Plaintiff was mildly limited in his activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (*Id.*)  She did not assign any functional restrictions, but instead assessed that Plaintiff appeared to be doing well and had no severe psychotic symptoms. (*Id.*)

State agency psychologist Karla Voyten, Ph.D., reviewed the record in December 2013.  (Tr. 99.)  She opined that Plaintiff had moderate limitations in maintaining social functioning. (*Id.*)  Dr. Voyten found that Plaintiff could perform low stress work that did require strict adherence to time or production based quotas and that he could make simple work-related decisions. (Tr. 102-03.)  Dr. Voyten also recommended that Plaintiff work independently of other employees. (Tr. 103.)

C.  **Hearing Testimony**

1.  **Plaintiff's Hearing Testimony**

Plaintiff testified that he had constant, sharp pain in his right ankle, which shot into his knee. (Tr. 36.)  His ankle swelled a few times every week, usually due to walking. (*Id.*)  Plaintiff took anti-inflammatory pills and used orthotics. (Tr. 37.)  He

10

estimated that he could walk half a mile, stand for one to two hours, and would have no trouble sitting. (Tr. 38.)  Due to a hernia, he did not lift greater than 15 pounds, but was not receiving any medical treatment for the condition. (*Id.*)  Plaintiff experienced burning in his feet every night. (Tr. 39.)

Plaintiff also suffered from depression, which interfered with his sleep and mood. (Tr. 40.)  He had difficulty holding jobs in the past due to anger. (Tr. 41.)  Plaintiff had argued with supervisors and coworkers and sometimes threw things. (*Id.*)

Plaintiff had no trouble living on his own, cooking, cleaning, performing self care, or grocery shopping. (Tr. 42-43.)  He recently started taking GED classes. (Tr. 44.) Plaintiff testified that he avoided other people, but he had a friend who would drive him to the store and to his classes. (Tr. 41, 43-44.)

### 2.    Vocational Expert's Hearing Testimony

Debra Lee, a vocational expert, testified at Plaintiff's hearing. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 50-51.)  The individual would be able to perform medium work and occasionally climb ladders, ropes, and scaffolds. (*Id.*)  The individual would be able to perform low stress work that did not require strict adherence to time or production quotas. (*Id.*)  The individual could make simple work-related decisions, would work best independent of other employees, could work where there was no "over the shoulder" supervision, and had the ability to adapt to infrequent and easily explained changes. (*Id.*)  The VE testified that the hypothetical individual would be capable of performing such jobs as a kitchen helper, industrial cleaner, and linen room attendant. (*Id.*)

11

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

12

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 1, 2016.

2.    The claimant has not engaged in substantial gainful activity since June 12, 2012, the amended alleged onset date.

3.    The claimant has the following severe impairments: dysfunction of a major joint; diabetes mellitus; obesity; hernia; chronic obstructive pulmonary disease; affective disorder; and alcohol, substance addiction disorders.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except with only occasional climbing of ramps/stairs; occasional climbing of ladders, ropes, or scaffolds; capacity for low stress work that does not require strict adherence to time or production based quotas; ability to make simple work-related decisions; capacity to work best independent of other employees; ability to work where there is no "over the shoulder" supervision; and ability to adapt to infrequent and easily explained changes.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born on June 12, 1957, and was 55-years-old, which is defined as an individual of advanced age, on the disability onset date.

8.    The claimant has at least a high school education and is able to

13

communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 12, 2012, through the date of this decision.

(Tr. 11-21.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported

14

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

#### 1.    Whether the ALJ Failed to Provide Good Reasons for Discounting the Opinions of Treating Physicians

Plaintiff argues that the ALJ failed to provide an adequate basis for assigning less than controlling weight to Plaintiff's treating physicians, Drs. Garlisi and Kuerbitz. The Commissioner disagrees.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants

15

understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

### i.    Dr. Garlisi

During November 2013, treating psychologist Dr. Garlisi completed a medical opinion questionnaire. (Tr. 611-13.)  Dr. Garlisi opined that Plaintiff had "poor or no useful ability" to perform at least eight different work activities, including the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (*Id.*)  In assessing Dr. Garlisi's opinion, the ALJ wrote:

> The undersigned gives this assessment little weight because it is obvious from a review of the form, that the form was completed based on the claimant's functioning during past work when he was abusing alcohol and drugs. In fact, Dr. Garlisi noted that the claimant "clinically does not seem to be able to work based on previous behaviors and mood."  The undersigned notes that Dr. Garlisi's opinions are not supported by the medical evidence of record and his current presentation does not suggest such severe limitations.  Dr. Garlisi also opined that the claimant will be absent from work more than twice a month due to his impairments or treatment.  This opinion regarding the claimant's absenteeism rate due to his impairments or treatment is merely speculative and the claimant sees no medical professional on a frequent basis.

(Tr. 19.)

Plaintiff asserts that each of the reasons the ALJ provided as grounds to discount Dr. Garlisi's opinion are factually inaccurate or otherwise insufficient to support her treating source analysis.  With regard to Dr. Garlisi's reliance on Plaintiff's past functioning, the evidence does not indicate that Plaintiff's substance abuse caused or contributed to his prior work issues or behavior.  Nor is it clear that Dr. Garlisi based her

opinion entirely on these behaviors.  Additionally, the ALJ's observation that Dr.

Garlisi's opinions were not supported by the medical evidence and Plaintiff's current

presentation is too conclusory for the Court to adequately assess without further

explanation from the ALJ.  If this were all the ALJ had said about the evidence, the case

could require remand.[2]

In this case, however, the ALJ's opinion, taken as a whole, thoroughly

evaluates the evidence and indicates the weight the ALJ gave it.  This provides a

sufficient basis for the ALJ's rejection of Dr. Garlisi's opinions, *see Nelson v. Comm'r*

*of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006), and affords this Court the

opportunity to meaningfully review the ALJ's opinion.  In *Nelson*, the ALJ failed to

discuss the opinions of two of the plaintiff's treating physicians, and the plaintiff argued

that this failure constituted a basis for remand.  The Sixth Circuit disagreed,

concluding that "the ALJ's evaluation of [the plaintiff's] mental impairments indirectly

attacks both the supportability of [the treating physicians'] opinions and the

consistency of those opinions with the rest of the record evidence."  195 F. App'x at

470.  Because the ALJ's discussion of the other evidence "implicitly provided sufficient

reasons for not giving . . . controlling weight" to the treating physicians, the Sixth

---

[2]    There is case law supporting the general proposition that an ALJ's broad
statement rejecting a treating physician's opinion without giving specific
reasons for rejecting it requires remand.  *See Wilson,* 378 F.3d at 545
(finding that the ALJ's "summary dismissal" of the opinion of the claimant's
treating physician failed to satisfy the "good reasons" requirement); *Friend
v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 552 (6th Cir. 2010) ("Put
simply, it is not enough to dismiss the treating physician's opinion as
incompatible with other evidence of record; there must be some effort to
identify the specific discrepancies and to explain why it is the treating
physician's conclusion that gets the short end of the stick.").

Circuit concluded that the ALJ's decision satisfied the purposes of the controlling physician rule. *Id.* at 472.

Here, the ALJ provided a substantial discussion and assessment of the evidence before evaluating the opinions of Dr. Garlisi. (Tr. 15-18.)  For example, the ALJ discussed the following evidence, which implicitly rejects Dr. Garlisi's opinions regarding Plaintiff's mental limitations:

- Plaintiff had mild difficulties in activities of daily living. (Tr. 12.)  Plaintiff testified that he lived alone in an efficiency apartment. (*Id.*)  He attended to his personal care, performed household chores, shopped, watched television, read, and used the computer. (*Id.*)

- Plaintiff had moderate difficulties in social functioning. (Tr. 13.)  Plaintiff testified that while employed, he argued with supervisors and coworkers, yelled, and threw things. (*Id.*)  He further testified that he no longer behaved this way, though he tried to stay away from people. (*Id.*)  He had at least one friend, who was from his housing complex and who drove him to the store. (*Id.*)  Plaintiff's sister was his support system. (*Id.*)

- Plaintiff had moderate difficulties with regard to concentration, persistence, or pace. (Tr. 13.)  Plaintiff testified that his ability to focus and concentrate was "not great" and he did not have much energy or motivation to do anything. (*Id.*)  Plaintiff reported that he did not handle stress or change very well. (*Id.*)  He read a few hours every day and went to the library three times a week. (*Id.*)  He used the computer and was able to thoroughly complete forms for the disability process. (*Id.*)

- The ALJ described the results of numerous mental status examinations, which showed largely normal findings. (Tr. 17-18.)  The ALJ concluded that the results were inconsistent with a disabling mental impairment. (Tr. 18.)  For example, during a mental status examination in November 2012, Plaintiff displayed a euthymic mood and appropriate affect. (Tr. 18.)  His thought process was coherent and goal-directed, his insight and judgment were good, and his cognition was grossly intact. (*Id.*)  Dr. Garlisi assigned a GAF score of 68. (*Id.*)  Later in March 2014, Dr. Garlisi described Plaintiff as well groomed, relaxed, and pleasant. (Tr. 18.)  His speech was organized, with a normal rate and tone and some decreased production. (*Id.*)  Plaintiff denied delusions and hallucinations. (*Id.*) His judgment and insight were fair. (*Id.*)

- Plaintiff reported that he self-stopped Risperidone because he had not experienced auditory hallucinations, and he thought that his past hallucinations could have been caused by synthetic marijuana use and alcohol withdrawal. (Tr. 18.)  Plaintiff also told Dr. Garlisi that he was sleeping well, even though he sometimes did not take Trazadone. (*Id.*)

- The ALJ assigned great weight to Dr. Voyten's opinion. (Tr. 19.)  Dr. Voyten opined that Plaintiff was capable of low stress work that did not require strict adherence to time or production-based quotas; Plaintiff could make simple work-related decisions; he would work best independent of other employees and without "over the shoulder supervision; and he could adapt to infrequent and easily explained changes. (*Id.*)

Had the ALJ discussed the aforementioned evidence immediately after stating that she was rejecting Dr. Garlisi's opinion, there would be no question that the ALJ provided "good reasons" for giving Dr. Garlisi's opinion less than controlling weight. The fact that the ALJ did not analyze the medical evidence for a second time (or refer to her previous analysis) when rejecting Dr. Garlisi's opinion does not necessitate remand of Plaintiff's case. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, n.6 (1969)).  Accordingly, Plaintiff's argument that the ALJ violated the treating physician rule as to Dr. Garlisi is without merit.

19

ii.     **Dr. Kuerbitz**

During November 2013, Dr. Kuerbitz completed a medical source statement. (Tr. 602-04.)  The physician opined that Plaintiff could walk three blocks without resting; stand or walk two hours of an eight-hour workday; sit for six hours in an eight-hour workday; occasionally lift and carry 20 pounds and frequently lift and carry ten pounds; bend or twist for 25 percent of a workday; and should avoid exposure to pulmonary irritants. (*Id.*)  Dr. Kuerbitz also opined that Plaintiff would be absent from work more than twice a month due to his impairments or treatment. (*Id.*)

Plaintiff takes issue with all but one of the reasons the ALJ provided for assigning less weight to Dr. Kuerbitz's opinion.  To begin, Plaintiff asserts that Dr. Kuerbitz properly considered Plaintiff's subjective complaints as part of her assessment. The ALJ discredited Dr. Kuerbitz because the physician solicited Plaintiff's input regarding some physical abilities. (Tr. 17, 271.)  It is not clear, however, that Dr. Kuerbitz based her opinion solely on Plaintiff's complaints, rather than her own assessment.  As a result, the Court is hesitant to conclude that this constituted good reason to discredit Dr. Kuerbitz.

Plaintiff also argues that the ALJ incorrectly found that Dr. Kuerbitz did not provide a basis for her physical restrictions.  Plaintiff maintains that Dr. Kuerbitz based the physical limitations on diagnoses of diabetes, hypertension, depression, emphysema, and ankle pain, which the doctor listed on the medical opinion form. (Tr. 602.)  The medical source form did not prompt Dr. Kuerbitz to provide a basis for the limitations assigned, aside from listing diagnoses. (*Id.*) These facts somewhat call into question the ALJ's reasoning.  The ALJ, however, correctly observed that Dr. Kuerbitz

20

provided no specific support for the limitations assigned, such as the results of medical imaging or physical examinations. (Tr. 17.)

Nevertheless, the ALJ provided other good reasons for assigning less weight to the Dr. Kuerbitz's opinion.  In addition, earlier in her opinion, the ALJ provided a thorough discussion of the evidence relating to Plaintiff's physical impairments, which implicitly rejects Dr. Kuerbitz's limitations.  The ALJ's opinion contained the following grounds for discounting Dr. Kuerbitz's limitations:

- The ALJ discussed evidence related to Plaintiff's hernia and ankle[3] impairments that was inconsistent with the limitations Dr. Kuerbitz assigned. (Tr. 17.) The ALJ noted that at the time of his application, Plaintiff did not list his hernia as contributing to his disability. (*Id.*)  There was no indication that Plaintiff sought treatment for the condition. (*Id.*) The ALJ pointed out that even Dr. Kuerbitz did not identify Plaintiff's hernia as a diagnosis on her medical source form. (*Id.*)  Regarding Plaintiff's ankle, the ALJ observed that Dr. Kuerbitz prescribed an anti-inflammatory, which Plaintiff admitted worked well. (*Id.*)  Plaintiff stated that after an adjustment to his orthotic, his ankle was much improved. (*Id.*)

- The ALJ assessed that Dr. Kuerbitz's limitation prohibiting exposure to pulmonary irritants was inconsistent with Plaintiff's smoking habit, which Plaintiff does not now contest. (Tr. 17.)

- The ALJ found that Dr. Kuerbitz's opinion that Plaintiff would miss work more than twice per month due to impairments or treatment did not comport with Plaintiff's treatment history.[4] (Tr. 17.)  The ALJ observed that Plaintiff did not treat with any medical professional for his physical

---

[3]  While Plaintiff points out that he also had diagnoses of diabetes, hypertension, depression, and emphysema, he does not direct the Court to evidence, aside from Dr. Kuerbitz's medical source opinion form, showing that these diagnoses resulted in physical limitations.

[4]  The ALJ also indicated that Dr. Kuerbitz's absenteeism finding was "speculative." (Tr. 17.) It is unclear what the ALJ intended by making this observation.  Regardless of the ALJ's intent, the ALJ properly concluded that Plaintiff's treatment history contradicted Dr. Kuerbtiz's conclusion that Plaintiff would miss work more than twice per month.

21

impairments on a frequent basis. (*Id.*)  This observation is substantially supported by the record.  During Plaintiff's last appointment with Dr. Logan, the podiatrist instructed him to return in 12 months. (Tr. 16.) On her medical opinion form, Dr. Kuerbitz indicated that she treated Plaintiff approximately every four months.[5] (Tr. 602.)

• The ALJ assigned greater weight to the opinions of Dr. Bradford and the state agency reviewing physicians, whose opinions contradicted Dr. Kuerbitz. (Tr. 17.) The ALJ credited these medical source opinions because they were consistent with the objective medical evidence, clinical findings on examination, Plaintiff's course of treatment, and Plaintiff's activities of daily living. (Tr. 16-17.)

• The ALJ highlighted the results of Dr. Bradford's physical examination. Dr. Bradford found that Plaintiff had a normal gait and moved easily about the room. (Tr. 15.)  Plaintiff's right ankle showed no misalignment or tenderness; had a full range of motion; and had normal stability, strength, and tone. (*Id.*)  The ALJ observed that Dr. Bradford's examination was otherwise unremarkable, aside from minimal x-ray findings, a small and reducible umbilical hernia, and a possible diagnoses of DJD in the ankle. (Tr. 15, 16.)

• Plaintiff walked nearly everywhere because he did not drive. (Tr. 16.)  A number of times each week, Plaintiff exercised by walking or by riding a stationary bike up to ten miles.  (*Id.*)

Thus, as the ALJ explained, the evidence surrounding Dr. Kuerbitz's opinion did not support the limitations she identified.  As a result, the ALJ met her burden of offering good reasons to support her decision to assign less than controlling weight to Dr. Kuerbitz.  Given that the ALJ's treating source analysis is substantially supported, remand is not appropriate.

---

[5]     Aside from Drs. Kuerbitz and Logan, it appears that Plaintiff underwent treatment for his physical impairments only through routine appointments with a nutritionist.

22

2.    **Whether the ALJ Erred by Failing to Consider Plaintiff's Strong Work History When Determining the RFC and Assessing Credibility**

Plaintiff asserts that the ALJ erred in failing to consider and discuss his work history prior to his alleged disability onset date while formulating the RFC and evaluating credibility.  Plaintiff maintains that remand is required for further consideration of this evidence.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.3d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

When a claimant complains of disabling pain, the Commissioner must apply a

23

two-step test known as the "Duncan Test" to determine the credibility of such complaints.  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain.  *Id.* Second, if there is such an underlying medical condition, the Commissioner must examine whether the objective medical evidence confirms the alleged severity of pain, or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain.  *Id.* In making this determination, the ALJ must consider all of the relevant evidence, including six different factors.[6]  *See Felisky,* 35 F.3d at 1039-40 (citing 20 C.F.R. § 404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman v. Chater,* 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).

      Here, a review of the ALJ's decision reveals that the ALJ did not discuss

---

[6]    These factors include the following:
(1) the claimant's daily activities;
(2) the location, duration, frequency, and intensity of the claimant's alleged pain;
(3) precipitating and aggravating factors;
(4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain;
(5) treatments other than medication that the claimant has received to relieve the pain; and
(6) any measures that the claimant takes to relieve his pain.

24

Plaintiff's work history[7] when assessing the RFC and credibility, but the ALJ discussed

most, if not all, of the remaining relevant factors in her assessment of Plaintiff's physical

and mental condition. (Tr. 14-19.)  The ALJ examined Plaintiff's daily activities, his

treatments and his responses to those treatments, the clinical examination findings, and

the physician and psychiatrists' statements of record. (*Id.*)  The ALJ provided

reasonable grounds for finding Plaintiff less than credible:

- The ALJ explained that Plaintiff's activities of daily living were inconsistent with disabling impairments or pain. (Tr. 16.)  A few times each week, Plaintiff did a considerable amount of walking and rode a stationary bike up to ten miles. (*Id*.)  Medical providers encouraged Plaintiff to increase his physical activity. (*Id*.)  Plaintiff lived alone in public housing and independently engaged in a range of activities without issue. (Tr. 14.)

- As to treatment methods, Plaintiff reported that anti-inflammatory medication and orthotics provided good relief for his ankle pain. (Tr. 16.)  Plaintiff self-stopped taking Risperidone because he had not been hallucinating. (Tr. 18.)  Plaintiff admitted that he slept well, even when he skipped Trazodone. (*Id.*)

- Plaintiff testified that he tried to stay away from people, but also admitted that he had made friends in the apartment complex where he lived. (Tr. 14, 18.)

- The ALJ assessed that the results of mental status examinations were not consistent with a disabling mental impairment. (Tr. 18.)  Dr. Garlisi's examinations reflected that Plaintiff was generally euthymic, had an appropriate affect, was relaxed, was alert and oriented, and had organized speech. (*Id.*)

As, the ALJ discussed most of the relevant factors, which substantially support

the decision to discount Plaintiff's credibility, Plaintiff's second assignment of error does

---

[7]     The ALJ acknowledged that Plaintiff had past relevant work as a fast food and short order cook, indicating that the ALJ was aware of and had considered Plaintiff's prior work. (Tr. 20.)  Plaintiff has not cited any authority that requires the ALJ to expressly discuss a claimant's work history when evaluating the RFC or assessing a claimant's credibility.

not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is

AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: October 8, 2015